```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    BCBSM, INC. (D/B/A BLUE       )  Docket No. 20 C 01853
     CROSS AND BLUE SHIELD OF      )
4    MINNESOTA), et al.,           )
                      Plaintiffs,  )  Chicago, Illinois
5                                  )  October 16, 2020
                 v.                )  11:41 a.m.
6                                  )
     WALGREEN CO., et al.,         )
7                      Defendants. )
     ------------------------------)
8    HEALTHNOW NEW YORK, et al.    )
                      Plaintiffs,  )
9                                  )
                 v.                )  Docket No. 20 C 01929
10                                 )
     WALGREEN CO., et al,          )
11                     Defendants  )
     ------------------------------)
12   HORIZON HEALTHCARE SERVICES,  )  Docket No. 20 C 03332
     INC. (D/B/A HORIZON BLUE CROSS)
13   BLUE SHIELD OF NEW JERSEY), et)
     al.,                          )
14                     Plaintiffs, )
                                   )
15               v.                )
                                   )
16   WALGREEN CO., et al.,         )
                      Defendants   )
17   ------------------------------)
     BLUE CROSS AND BLUE SHIELD    )  Docket No. 20 C 04738
18   OF ARIZONA INC. (d/b/a Blue   )
     Cross Blue Shield of Arizona and)
19   d/b/a AZBlue,                 )
                      Plaintiff,   )
20                                 )
                 v.                )
21                                 )
     WALGREEN CO. and WALGREENS    )
22   BOOTS ALLIANCE, INC.,         )
                      Defendants.  )
23

24

25
```

| | | |
|---|---|---|
| 1 | ASURIS NORTHWEST<br>HEALTH, et al., | )  Docket No. 20 C 04940<br>) |
| 2 | | ) |
| | | )  Plaintiffs,          ) |
| 3 | | ) |
| | | v.               ) |
| 4 | | ) |
| | WALGREEN CO. and WALGREENS | ) |
| 5 | BOOTS ALLIANCE, INC., | ) |
| | | ) |
| 6 | | Defendants          ) |

7

8

TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE VIRGINIA M. KENDALL

10

11

12

13

14

15

16

17

18

19

20

GAYLE A. McGUIGAN, CSR, RMR, CRR
21          Federal Official Court Reporter
219 South Dearborn, Room 2504
22            Chicago, Illinois 60604
(312) 435-6047
23        Gayle_McGuigan@ilnd.uscourts.gov

24

25

```
 1    TELEPHONIC APPEARANCES:

 2    For the Plaintiffs:      WILLIAMS MONTGOMERY & JOHN LTD by
                               MR. DAVID LEE APPLEGATE
 3                             233 South Wacker Drive, Suite 6100
                               Chicago, Illinois  60606
 4
                               CROWELL & MORING LLP by
 5                             MR. KENT ALAN GARDINER
                               MS. JACINTA L. ALVES
 6                             MR. STEPHEN J. McBRADY
                               MR. JUSTIN DAVID KINGSOLVER
 7                             MS. KELLY HIGHTOWER HIBBERT
                               1001 Pennsylvania Avenue, NW
 8                             Washington, DC  20004

 9    For the Defendants:      ROPES & GRAY LLP by
                               MR. JEFFREY J. BUSHOFSKY
10                             MS. LAURA GAFFNEY HOEY
                               191 North Wacker Drive, 32nd Floor
11                             Chicago, Illinois  60606

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Proceedings heard in open court:)

 2              THE CLERK:  20 C 1853, BCBSM versus Walgreen.

 3              THE COURT:  Okay.  Good morning.  This is Judge

 4     Kendall.  You're on the record and you're in open court, so

 5     please state your names.

 6              MR. APPLEGATE:  Good morning, your Honor --

 7              UNIDENTIFIED SPEAKER:  Please, Counsel, go ahead.

 8              MR. APPLEGATE:  Good morning, your Honor.  David

 9     Applegate, local counsel for plaintiffs.

10              THE COURT:  Okay.

11              MR. GARDINER:  Good morning, your Honor.  Kent

12     Gardiner, counsel for plaintiffs, from the Crowell & Moring law

13     firm.  And with me on the call as well are Jacinta Alves, Kelly

14     Hibbert, and Justin Kingsolver.

15              MR. McBRADY:  And Steve McBrady.

16              THE COURT:  Okay, so let me --

17              MR. BUSHOFSKY:  Your Honor, Jeff --

18              THE COURT:  Wait, wait, wait.  Wait, hold on a second.

19              So that was Stephen McBrady, Kent Gardiner, Jacinta

20     Alves, Kelly Hibbert, and Justin Kingsolver.  Is that right?

21              MR. APPLEGATE:  Yes, your Honor.

22              THE COURT:  Okay.  Thank you.

23              MR. BUSHOFSKY:  Your Honor, we have fewer people for

24     Walgreens, so I'll just let my colleagues introduce themselves.

25              My name is Jeff Bushofsky from Ropes & Gray here for
```

1   Walgreens.

2          THE COURT:  Okay.  Good morning.

3          MR. BUSHOFSKY:  Good morning.

4          MS. HOEY:  Good morning, your Honor.  Laura Hoey with

5   Ropes & Gray, also for Walgreens.

6          THE COURT:  Hello.

7          MS. HOEY:  Good morning.

8          THE COURT:  Okay.  Is that everyone?

9          MR. BUSHOFSKY:  I believe so, your Honor.

10         THE COURT:  Okay.  All right then.  Let me -- well,

11  let's hear from the movant, Walgreens, about what your issues

12  have been.

13         Of course, I received your brief and your exhibits, so

14  go ahead.

15         MR. BUSHOFSKY:  So, your Honor, by, (inaudible - audio

16  feedback) here on several cases that have now been

17  consolidated --

18         THE COURT:  Hold on.  Hold on.  Hold on just a second.

19  We're having --

20         MR. BUSHOFSKY:  This is Jeff Bushofsky.

21         THE COURT:  Wait, wait.  We're having some trouble,

22  so -- I don't know what you're speaking into, but either get

23  closer to your microphone -- if you're on speaker, go off the

24  speaker maybe and see if --

25         MR. BUSHOFSKY:  All right.  Your Honor, listening in

1    to the prior hearing, I think everyone on our side was having

2    some technical difficulty hearing the Court speak, but we

3    didn't have that issue with counsel.

4           Can -- how -- how is this?  I've taken myself off the

5    speaker.

6           THE COURT:  That sounds perfect.

7           How is this?  Do you hear me?

8           MR. BUSHOFSKY:  Your Honor --

9           THE COURT:  All right.  Hold on a second.  Let's see

10   what we can do.

11          THE CLERK:  I can try disconnecting and reconnecting.

12          THE COURT:  Okay.  All right.  You tell them.

13          THE CLERK:  Okay.  I'm going to disconnect and

14   reconnect, so just have a little patience.

15          Thank you.

16      (Pause in proceedings.)

17          THE CLERK:  Okay.  This is Judge Kendall's courtroom.

18   Can you hear us?

19          UNIDENTIFIED SPEAKER:  Yes.

20          THE COURT:  This is Judge Kendall.  Most importantly,

21   can you hear me?

22          UNIDENTIFIED SPEAKER:  Yes.

23          THE COURT:  Is it better than before?

24          UNIDENTIFIED SPEAKER:  Much better, your Honor.

25          THE COURT:  Okay.  Well, the system is going to be the

 1  death of us, I'll tell you.

 2          Okay.  So everybody mute your calls except for the

 3  individual who is going to argue for Walgreens.  Okay?  That

 4  will help.

 5          MR. BUSHOFSKY:  Absolutely, your Honor.

 6          THE COURT:  All right.

 7          MR. BUSHOFSKY:  Your Honor, it's Jeff Bushofsky from

 8  Ropes & Gray, again, for Walgreens.  And we're the movant on

 9  this motion for sanctions under Rule 11 and Section 1927.

10          Just by way of background, I understand your Honor is

11  ready to hear argument.  But there's been one brief so far, and

12  it's our opening brief in support of the motion.  I'm prepared

13  to address the issues, if your Honor would like, right now.

14          THE COURT:  Yeah, that's fine.

15          MR. BUSHOFSKY:  Okay.  So there are five cases

16  involved.  They've all been consolidated before your Honor.  If

17  you'd like for me to read the case numbers and the names of the

18  cases into the record, I'm happy to do that, your Honor.

19  Otherwise, I'll move on.

20          THE COURT:  No, I think what I'll do, just for our

21  record, is that we've got 20 C 1853, 20 C 1929, 20 C 3332, 20 C

22  4738, and 20 C 4940.

23          And go ahead now.

24          MR. BUSHOFSKY:  Sure.  And, your Honor, Jeff Bushofsky

25  again.  It's 5 cases, nearly 30 insurers are suing Walgreens

1    for an alleged decades-long fraud scheme purportedly

2    misappropriating hundreds of millions of dollars.  But a large

3    number of the claims that plaintiffs collectively assert and

4    individually assert don't even meet the standards of Rule 11 or

5    Section 1927, let alone Rule 9 or Rule 8 of the federal rules.

6         And so, as you know, we have -- Walgreens has motions

7    to dismiss pending under 12(b) -- it's on 12(b)(7).  The

8    12(b)(7) argument deals with the absence of crucial

9    intermediaries, the PBMs in this case.

10        But the Rule 11 and Section 1927 motion that we've

11   brought more recently deals with only the most, in our view,

12   egregious and unsupportable claims and allegations.

13        They fall into two relatively broad categories that,

14   unfortunately, don't overlap completely with the different

15   cases.

16        One is I think the easiest one to understand and

17   describe, which is the Illinois Consumer claims, which span

18   nearly all of the allegations in the complaints.  And I'll get

19   to those in a minute.

20        And then the second fraud category are claims for

21   fraud -- consumer fraud, negligent misrepresentation and the

22   like that are not only unsupported by any facts and would have

23   been revealed as unsupported had the plaintiffs and their

24   counsel done a reasonable investigation, but are also

25   completely contradicted and undermined by indisputable facts

1    that plaintiffs and their counsel are now well aware of because

2    they've been provided to plaintiffs and their counsel through

3    motion practice and through the Rule 11 letter cycle, which I

4    think it's undisputed is complete, that in compliance with Rule

5    11 and with Seventh Circuit precedent about the -- the

6    predicates to a Rule 11 sanctions motion, that's been

7    completed.  And those letters are attached to our moving

8    papers.

9         The second category that I was beginning to describe

10   as being unsupported by facts and contradicted by facts that

11   could have been easily investigated and discovered at least

12   after the complaints were filed, and the more recent complaints

13   were filed with full knowledge by plaintiffs' counsel about

14   these facts, relate to the PBM contracts themselves.

15        The first and maybe the largest complaint is the Blue

16   Cross/Blue Shield of Minnesota complaint, as we have described,

17   which is the case ending with docket number 1853.  Pages 18

18   through 26 of that complaint is a long recitation of the

19   insurers', the plaintiffs in these cases, contract definitions

20   of "usual and customary."

21        And our understanding, and I think it's clear from the

22   pleadings, is that that recitation in the complaint is there to

23   establish the insurers' allegedly reasonable expectations that

24   Walgreens would report any and all discounts, including club

25   discounts, as usual and customary, or U and C.  And then on

1      page 25, there's an information and belief allegation that

2      Walgreens' contracts in the specified Prime contract with the

3      insurers' PBM as containing the same definition.

4              And the core theory, as we understand it -- and it's

5      been described in the briefing, and it's clear from the face of

6      the complaint, in our view -- is that Walgreens knew or should

7      have known what the insureds' reasonable expectations were, and

8      those reasonable expectations are tied to contractual terms

9      about what "U and C" or "usual and customary" mean.

10             However, the contracts that Walgreens actually signed,

11     at least the most recent contracts that are at issue here, for

12     the vast majority of these insurers -- and I'd say -- I believe

13     it's 20 out of 28 -- actually have clear, unambiguous terms

14     excluding discounts, including these club discounts that are at

15     issue in this case from the definition of "usual and

16     customary."

17             And so those -- those claims, we believe, are subject

18     to Rule 11 and 1927 because they are not only without any

19     factual basis, they were made on information and belief

20     originally, but we've now -- Walgreens has now made it clear

21     through indisputable facts that the claims are without a valid

22     factual basis and a reasonable inquiry by counsel and their

23     clients would have revealed that.

24             And so to limit the distraction, the cost, frankly,

25     the disparagement that Walgreens is facing through many of

1    these claims, we brought the sanctions motion.  We take it very

2    seriously.  Obviously, it was not a motion that we took lightly

3    or one that applies to all of the claims, even though we are

4    moving to dismiss all of their claims.  We tried to focus, and

5    I think we did, on only the most egregious examples.

6         And, your Honor, I can pause for a second if you have

7    any questions, but I'd like to get into one or two of the most

8    stark of those unsupported claims and the positions.

9         THE COURT:  No, that's fine.  Go right ahead.

10        MR. BUSHOFSKY:  Okay.  The first one, as I said

11   earlier, which is the most obvious and probably easiest,

12   hopefully, for me to describe, are the many claims that assert

13   Illinois Consumer Fraud Act violations.

14        Going back to 2005, I believe it was, and it was a

15   case that I was lucky enough at the end of the day, unlucky

16   enough at the beginning of that case to be involved with, is --

17   is the *Avery versus State Farm* case.  At least since then --

18   although I think before 2005, there was some question,

19   particularly in your Honor's courthouse -- that the Illinois

20   Acts do not apply to extra Illinois or extraterritorial

21   transactions.  And in that case, just like in this case, you

22   had an Illinois -- large Illinois company, was Illinois based

23   and Illinois organized -- in that case, State Farm -- was

24   alleged to have, you know, committed consumer fraud -- Illinois

25   Consumer Fraud around the country in all 50 states.  The

1    Supreme Court unequivocally rejected that on appeal and set the

2    standard that's been crystal clear for 15 years since.

3         Regardless of the fact that Illinois is where

4    Walgreens is headquartered, if transactions involve

5    non-Illinois companies or non-Illinois consumers, to the extent

6    there's a consumer nexus, right?  And we're talking about

7    insurance companies that almost by definition are organized

8    under specific state law and serve specific state individuals.

9    Here, none of those plaintiffs in these cases include any

10   Illinois insurers.  And I believe there's one allegation about

11   a handful of Illinois claims that were filled for the Arizona

12   company.  Out of an abundance of caution, we're not moving for

13   sanctions based on the Illinois Consumer Fraud allegations and

14   claims with regard to that Blue Cross insurer, Arizona, so I

15   set that aside.  There's no suggestion in any of the complaints

16   and, frankly, no suggestion in any of the motion papers or in

17   the responses to our Rule 11 letters that there's any

18   connection whatsoever to Illinois for all of the insurers'

19   claims except for, arguably and potentially, a handful of

20   claims for the 1 out of 28 insurers in Arizona.

21        We brought the law to counsels' attention -- and, by

22   the way, this particular issue relates specifically to 1927.

23   It doesn't relate to -- and Rule 11, but only to counsel.  It's

24   not one we're bringing against the individual insurers.  We

25   brought the law and defense that are alleged to plaintiffs' and

1    counsels' attention through motion practice and through the

2    Rule 11 letters.  The response, essentially, has been -- and,

3    "essentially" is probably being kind, it's precisely what the

4    argument is -- that Consumer Fraud Act, including the Illinois

5    Consumer Fraud Act, should be read broadly by the courts.

6            That we say is a truism that -- we don't disagree with

7    that.  But it doesn't actually address the point that there's

8    lack of other case law in Illinois that precludes these claims.

9            After a series of motions, a series of briefs, and a

10   series of letters, we think that sanctions are appropriate in

11   this case because there's no basis for those Illinois claims.

12   And those claims are important.  It's not just a sideline in

13   these complaints.

14           As your Honor knows well, there's lowered standards in

15   terms of pleading and also in terms of scienter in *Kent*,

16   reasonableness or the lack of need for reasonableness on the

17   part of the purported victims.  And in federal court in

18   Illinois as opposed to state court, you get a jury for Illinois

19   Consumer Fraud Act claims.  So this is a big deal.  This

20   basically lowers the bar, if it's allowed to proceed, for the

21   plaintiffs.  And it's precisely what was at issue in *Avery*

22   where the larger part of the judgment -- which was reversed,

23   which was a historically large one at the time -- was related

24   to the Consumer Fraud Act claims.

25           And so it's not -- you know, we understand that

1    sometimes there's a kitchen sink pleading where lawyers throw

2    in like to have arguments, and we're not quibbling with that.

3    We're way past that.  We've demonstrated to them chapter and

4    verse why these are invalid claims and why they should be

5    withdrawn, and they have not done so.

6           Moving on to the, factually, undermined claims,

7    probably the starkest and most egregious example is Alabama.

8           The Alabama Blue Cross/Blue Shield allegation in the

9    complaint states that U and C applies to -- or, rather,

10   includes discounts except club discounts and specifically says

11   that it doesn't include discounts -- and let me just find it,

12   your Honor -- specifically does not include -- and this is

13   subparagraph G and H on page 21 of the first complaint, that

14   BCBS of Minnesota complaint, under a caption that says BCBS of

15   Alabama, the definition is underlined.  It says that U and C,

16   quote:  Includes any applicable discounts, including, but not

17   limited to, senior discounts, frequent shopper discounts, and

18   other special discounts offered to attract customers.

19          If it ended there, your Honor, we wouldn't have an

20   argument.  But it doesn't end there.  Here are the last words:

21   Except for those discount programs in which the customer pays

22   for membership.

23          That's exactly the type of club discount

24   membership-based paid-for program that's at issue in this case,

25   Walgreens PSC discount club.

1    We brought this to counsels' attention.  We brought it

2    to BCBS of Alabama's attention, multiple ways, through the

3    letters as well as motion practice.  They've not directly

4    addressed the Alabama situation, as far as we know, in any --

5    in any writing.  And so that's -- that's an extreme example.

6    That's, Alabama -- Alabama Blue's own contract.  And as I read

7    to you before, pages 18 through 26 of the complaint, of that

8    particular complaint, lays out the fraud premise, that these

9    insurers supposedly had reasonable expectations that Walgreens

10   would submit club discount prices as the, quote, usual and

11   customary prices based on the insurers' contracts with their

12   PBMs.  I just read to you what the Alabama insurers' contract

13   with its PBM actually says.

14       As we understand it, reading that, which is in the

15   pleading, there's no way that they could have reasonably relied

16   on something different.  There's no way that they could have

17   expected Walgreens to submit discounted prices from a paid-for

18   program as part of U and C.  And they haven't responded in any

19   substantive way to our arguments.  That's Alabama.

20       There is a much larger number of other insurers whose

21   allegations are also undermined by contractual terms.

22       They all entered pretty broad swaths, and probably the

23   easiest way to look at this, your Honor, is in the

24   attachment -- or I suppose it's part of the body of our actual

25   motion, the speaking motion.  It's a chart.  And I think we'll

1    update it for your Honor in our reply brief if there is further

2    briefing on this issue, or we can submit it to your Honor with

3    your permission.

4         What I -- what I would like to add upon preparing for

5    today, I thought it would be helpful, is an extra column that

6    groups these different insurance companies by the contract

7    that's at issue that undermines their claims.

8         And so after the -- after the Alabama row, there's a

9    row of insurers who, plaintiffs, from different lawsuits who

10   all share in common that they had Express Scripts as one of

11   their PBMs or their most recent PBM.  And their claims are

12   undermined by the specific terms of Walgreens' PBM contract

13   with Express Scripts, which is in contrast and somewhat

14   different from the Alabama situation where Alabama's own

15   contract with Prime in that case, a PBM, undermines their

16   claim.

17        And so just as a reminder, and I think your Honor

18   knows this from hearing from us earlier, you have a

19   transactional chain, a commercial relationship, and this has

20   nothing to do with government programs, has nothing to do with

21   Medicaid or Medicare, despite the fact that plaintiffs have

22   cited Medicare rules and guidance and things like that to

23   support their, quote, industry standard definition of "usual

24   and customary," which actually contrasts with the contractual

25   definitions that are at issue here.

1          But putting those government programs aside, the

2     transactions here involve three parties in every case.  You've

3     got Walgreens, you've got a PBM in the middle, and you've got

4     an insurance company that ends up paying the claims.  The

5     insurers -- all the insurers in this case are affiliates of

6     Blue Cross/Blue Shield, but they all have different PBMs.  And

7     so they have a contract with a PBM -- in many cases, it's

8     Prime, in many cases, it's Express Scripts, there are others --

9     and then that same PBM will have a separate contract with

10    Walgreens.

11          Interestingly, and as you've seen perhaps in the

12    papers, there's not visibility across the transaction.  So

13    until this litigation, Walgreens had no reason to know

14    specifically what the PBM insurance contract said.  And in the

15    allegations in the complaints, the Blue Cross insurers claim --

16    the plaintiffs claim that they had no reason to know

17    specifically what the PBM Walgreens' contract said about this U

18    and C issue or anything else, which is why in their opening

19    salvo, the first Blue Cross/Blue Shield of Minnesota complaint,

20    the allegations about Walgreens' understanding and obligations

21    was based on information and belief.

22          In these swaths of plaintiffs, which straddle the five

23    complaints, there are Express Scripts plaintiffs, for which

24    Express Scripts was the company that was their PBM.  There are

25    Caremark plaintiffs.  And there are OptumRx plaintiffs.  And,

1    again, those categories are based on which PBM contracts are at

2    issue.

3    In each one of those, which collectively represent the

4    vast majority of the plaintiffs, the PBM contracts with

5    Walgreens stated clearly that club discounts, or any discounts

6    in some cases, should not be part of the U and C reporting.

7    And so our position is that for many or all of those, the

8    plaintiffs just got it wrong.  They guessed wrong.  Their

9    information and belief was wrong.  We brought the facts to

10   their attention.  The facts are contradictory to the

11   allegations.  The response was, essentially, those contracts

12   don't matter now, despite what we said in our complaint, in the

13   many paragraphs and pages that I read to your Honor.  This is

14   all about industry standards.  And industry standards and case

15   law about what Medicare and Medicaid regulations and guidance

16   say, that's what's important.  You should have known, and you

17   didn't include these discounts in your reported prices.  So

18   just like the government -- even though we're not the

19   government, and we don't have the same rules, and we're bound

20   by contract, not Medicaid regulations and guidance -- you

21   defrauded us.

22   We don't believe that that holds any water,

23   particularly in light of the documents that we brought to

24   plaintiffs and plaintiffs' counsels' attention, and so we don't

25   think that those claims should remain on the docket under Rule

1    11 or 1927, separately, completely apart from 12(b)(6) and

2    12(b)(7).

3              So that's the basic argument, your Honor.  Happy to

4    answer any questions.

5              THE COURT:  No.  Let me hear from the other side,

6    please.

7              MR. GARDINER:  Okay, your Honor.  This is -- this is

8    Kent Gardiner for the plaintiffs.  And I'll take the lead on

9    responding to that.

10             I would -- let me just offer up at the beginning,

11   we're -- we're certainly prepared to talk to you at whatever

12   length you'd like about all this, and we will; but just to make

13   a procedural observation, we are almost through full and

14   extensive briefing on Rule 12.  We've had a series of motions

15   to dismiss.  We've responded to them.  I think all but one of

16   the replies is -- has been tendered and filed.

17             When we met with your Honor back in (inaudible) --

18             COURT REPORTER:  Excuse me.  This is the court

19   reporter.

20             Are you on a speakerphone?

21             MR. GARDINER:  I am.  I tried to put on a headset and

22   it -- all it did was kick me off the call, so I -- is that --

23   is it better if I just get closer, or am I not being heard?

24             COURT REPORTER:  It is better.

25             The last thing I have is, "When we met with your Honor

1    back in."

2        MR. GARDINER:  Okay.  I'm sorry.  I'll do my best to

3    be as clear as I can and go slowly.

4        We met with your Honor in mid-July and had our status

5    conference.  Your Honor noted that discovery should be held in

6    abeyance while the Rule 12 process played out.  The process has

7    nearly played out.  Your Honor was nice to say that your plan

8    was to attend to those Rule 12 motions promptly so that we

9    could decide if we were proceeding in the discovery and in what

10   ways.  We're just about there.  And so the idea that we're now

11   having a parallel Rule 11 track seems to us to not only be

12   unseemly but also be quite inconsistent with what Rule 11

13   decisions have said many, many times, which is that they --

14   they -- if they come at all, they come after there have been

15   decisions on the legal merits of the complaint, with all

16   pleaded facts accepted as true, and on we go.  And it would

17   seem to be a much more effective way to deal with this.

18       I would note that when we -- when we did meet with

19   your Honor, plaintiffs' counsel said nothing about these

20   concerns.  We simply talked about Rule 12 and the process for

21   that.  And then it wasn't until that night, after the

22   conference was over, that the first letter arrived.  So if

23   they've had these concerns all along, it would have been quite

24   easy to take them up with your Honor that day, and we could --

25   we could have dealt with this, which we think it can be dealt

1    with quite easily, and then get to the broader Rule 12 process.

2         But I guess what -- all I would say, before I go into

3    the substance of it, is if your Honor is inclined to do

4    anything with the merits of this Rule 11 attack before the Rule

5    12 motions are decided, we would ask for an opportunity to

6    brief the issues.  There's a lot in their motion that's wrong,

7    more than I think we can cover today.  And we would certainly

8    appreciate and ask for the opportunity to reply and (audio

9    feedback - inaudible).

10        Having said that, just to -- just to talk about it for

11   this -- for purposes of this hearing, I think it -- I think it

12   will help the Court to just go back to some basics about what

13   this litigation is all about.  And it's really quite a

14   straightforward case, and so it won't take long.

15        Just to remind your Honor, so that -- the health plans

16   or the plaintiffs here, they -- they reimburse Walgreens for

17   drugs that Walgreens sells to their members.

18        So a member walks in off the street, purchases a drug,

19   Walgreens sells it, and then gets reimbursed from the health

20   plan.

21        Walgreens is required to charge the plan the lesser of

22   either a price it negotiates with the plan or this U and C

23   price.  And the U and C (inaudible) is just -- is really quite

24   simply (inaudible) when they're walking off the street,

25   without --

1          THE COURT:  Okay.

2          MR. GARDINER:  (inaudible) to a cash customer.

3          THE COURT:  Hold on a -- hold on.  You actually went

4     completely out for a moment.

5          So, Gayle, can you tell him where he left, please?

6      (Record read.)

7          MR. GARDINER:  It's basically designed to ensure that

8     a health plan isn't paying more than a cash customer walking in

9     off the street.

10         Walgreens did not give the plan the benefit of those

11    discount prices.

12         So all of that so far, your Honor, is undisputed.

13         Walgreens says it did not have to.  It did not have to

14    give those discounted prices to the plans because it had

15    created these savings clubs.  And it says it charged a fee.

16         The plan's position is that the fact that you call it

17    a savings club, if you still make it available to everyone,

18    still has to be given to the plans.  And that is the

19    Seventh Circuit's decision in *Garbe*, quite clearly.

20         Various, we allege this, various of Walgreens'

21    programs had no fee, and so this fee issue just doesn't exist

22    with regard to a certain number of their -- of their prices.

23         With regard to the ones where they say they charged a

24    fee, we know from their settlement with the U.S. Department of

25    Justice that the fee was basically a sham, that they reimbursed

1    the customers for the fees after they were paid.  So there

2    really was no fee at the end of the day.  That's our position.

3    That's basically our case, that all of these discounted prices

4    had to be given to the plans, and they weren't.  And that is,

5    as defense counsel said, hundreds of millions of dollars in

6    overpayments by the plans.

7         So -- so their motion for sanctions, as you heard,

8    there are three grants.  The first one arises because Walgreen

9    contends that because it's put a fact into the case, that the

10   case is over.  And what's the fact?  The fact -- which, of

11   course, hasn't been tested in discovery -- is that Walgreens

12   entered into contracts with PBMs, not with the plans, and the

13   contracts had language that said that discounts were now part

14   of U and C.

15        Now, as we -- as you've heard, the PBMs sit between

16   Walgreens and the plans, and they process claims.

17        And so Walgreens has disclosed to us contracts,

18   amended contracts apparently, that they reached with PBMs in

19   2017, so that is seven years into this scheme, that there is an

20   amended contract that purports to exclude discounts, and so

21   Walgreens says case over because of these contracts.

22        Our position is that, first of all, Walgreens is

23   ignoring all other sources of information about what "U and C"

24   means.  It may be that language they have in their amended

25   agreements with -- with PBMs has some -- some relevance to

1    trying to figure out what is the definition of "U and C" in

2    Walgreens' mind, in our plans' mind, and what defines the

3    obligation and therefore the fraud.

4           Our complaint is full of detailed recitations of other

5    statements of what "U and C" means, governmental, private, even

6    some from Walgreens now itself that are at odds with that, at

7    odds with what they have now put in as a single fact.

8           And from a legal standpoint, this is nearly precisely

9    the issue that came up in the Ninth Circuit's decision in

10   *Corcoran*.  And so there, different pharmacy, it was CVS, CVS

11   said, ah, we've got amended agreements with PBMs that say that

12   U and C doesn't have -- doesn't extend to discounts.

13          The Court, dealing with it on summary judgment, not

14   even Rule 12, reversed a grant of summary judgment and sent it

15   back and said all those issues are for the jury.  And these

16   amended contracts could mean anything.  In fact, I'll just

17   briefly quote to your Honor from the Ninth Circuit's decision.

18   "In some cases, the PBMs even amended the agreement to exclude

19   explicitly membership programs from their definition of 'U and

20   C.'"  So just like what you're hearing here.  But this same

21   evidence could show the opposite, that the "U and C"

22   definitions in the PBM contracts encompass the HSP, the savings

23   club prices.  A jury could reasonably infer that subsequent

24   modifications of the agreements indicate that the prior

25   definitions of "U and C" included HSP prices.

1          So the Court deals with this directly and labels it

2   what it is, which is at most a fact issue.  It's not

3   case-deciding.  We don't even think it's going to be a fact

4   issue very long once all of the evidence as, under law, as our

5   allegations in our complaint is allowed to be developed in

6   discovery.

7          So that is the first and the broadest of their

8   accusations against us.

9          And we think it comes (audio feedback - inaudible).

10  It is, at best, a Rule 12 issue, but we think really it's not

11  even relevant until we get to Rule 56, if we go -- get there.

12          THE COURT:  Okay.

13          MR. GARDINER:  And so right now on this issue, you've

14  got Walgreens arguing against *Garbe* from the Seventh Circuit,

15  clear decision*; Corcoran*, clear decision in the Ninth Circuit.

16  Upwards of ten courts that have considered these similar

17  arguments and denied motions to dismiss.

18          Now, we haven't moved for sanctions because they're

19  ignoring all this law because we think it's just not

20  appropriate, but it is certainly appropriate to consider that

21  our core basis, both legally and factually, is extremely

22  strong.

23          That's their first and biggest argument covering most

24  of the plans here.

25          The second is their argument about the plan Blue

1    Cross/Blue Shield of Alabama.  And this is a different contract

2    that they're focused on.  Not a contract between them and a

3    PBM, but a contract between Alabama and a PBM.  And they cite

4    language that basically says U and C doesn't apply to a

5    situation where a member of a plan pays to enroll.

6            Walgreens, by the way, says nothing about similar

7    contracts between the 28 other plans in this case and their

8    PBMs.  For some reason, I think they're going to argue that

9    those are somehow irrelevant.  But they like this contract, and

10   so suddenly it's relevant and they say case dispositive.

11           Our argument as to Alabama's contract goes back to

12   Walgreens' settlement with the U.S. Department of Justice,

13   where they had to stipulate and admit that they reimbursed

14   their members for -- (audio feedback - inaudible).

15           COURT REPORTER:  I'm sorry, excuse me --

16           MR. GARDINER:  -- did not pay --

17           COURT REPORTER:  Excuse me.  Excuse me.  They

18   reimbursed their members for?

19           MR. GARDINER:  They reimbursed their members for the

20   membership fee that they charged them on (audio feedback -

21   inaudible).

22           COURT REPORTER:  I'm sorry --

23           MR. GARDINER:  Our allegations are --

24           COURT REPORTER:  Excuse me.  You broke up at the end

25   again.

1          "They reimbursed their members for the membership fee
2      that they charged them on."
3          MR. GARDINER:  That they charged them as part of the
4      membership program.
5          Our position, again, is that, at best, this is a fact
6      issue.  We allege that Walgreens in many cases did not charge a
7      fee at all; and in cases where they did charge a fee, by their
8      own admission, they paid it back.  And -- and so this contract
9      does not bar Alabama's claim.
10         What we need to do is go through the rest of fact
11     discovery and find out what Alabama understood, what Walgreens
12     understood, what Walgreens actually did with their membership
13     fees, all of which is appropriate for fact discovery as opposed
14     to threshold Rule 11 sanctions.
15         The last argument they make is about the Illinois
16     Consumer Fraud Act.  And as counsel made clear, they centered
17     their argument on the *Avery* case.  They basically say *Avery* is
18     black letter law.  It basically stands for the proposition that
19     out-of-state transactions and presumably out-of-state
20     plaintiffs can't rely on the statute and that the law is so
21     settled that we should be sanctioned for the complaint we have
22     filed.
23         Well, with all respect, your Honor, we would -- we
24     would direct the Court's attention to *Avery* itself.  What does
25     *Avery* say about this bright line that the plaintiffs are asking

1   the Court to apply?

2           Quote:  A plaintiff may pursue a private cause of

3   action under the Consumer Fraud Act if the circumstances that

4   relate to the disputed transaction occur primarily and

5   substantially in Illinois.  In adopting this holding, we

6   recognize that there is no single formula or bright-line test

7   for determining whether a transaction occurs within this state.

8   Rather, each case must be decided on its own facts.

9           And in terms of whether a plaintiff that is located

10  outside Illinois can, and may even be injured outside Illinois,

11  can still bring a cause of action under this Act, the Court

12  speaks to that as well.

13          Quote:  If, for example, the bulk of the circumstances

14  that make up a fraudulent transaction occur within Illinois,

15  and the only thing that occurs out of state is the injury or

16  deception, it seems to make little sense to say that the

17  fraudulent transaction has occurred outside Illinois.

18          Now, what have we alleged here?

19          We have alleged that the fraud perpetrated by

20  Walgreens did occur primarily and substantially in Illinois,

21  not only because Walgreens is located here and not only because

22  the fraudulent scheme that they created emanated -- again, in

23  the language of *Avery* -- from Illinois, but we allege far more

24  than that.  The entire scheme we allege was created in

25  Illinois.  The CEO of the company, Walgreens' CEO, on earnings

1    calls from Illinois, engaged in fraudulent misrepresentations

2    to the public, including our plans, about what the programs

3    were and were not.  That's paragraph 62.  In Illinois, the

4    price lists were created that omitted key information from

5    which the plans could have detected the fraud.  Paragraph 65.

6         This is not -- this is not the car repair facts of

7    *Avery*.  This is not people going in in Iowa to have their car

8    repaired and there's a problem with the repair and (audio

9    feedback - inaudible.)

10        THE COURT:  No, hold on.  It went out again.  Wait.

11   Hold on.  It went out again.  It's a bad connection or

12   something.

13        Go ahead, Gayle.

14     (Record read.)

15        MR. GARDINER:  And all of that is occurring out there

16   in the field in Iowa.

17        In our situation, you have health plans dealing with

18   Walgreens in Illinois.  Walgreens creates the scheme in

19   Illinois.  It sends reimbursement requests to the plans.  The

20   plans send money back to Illinois.  It's a direct ongoing

21   relationship and ongoing deception of the plans from Illinois.

22        And so our argument in our claim is that it is the

23   central focus of the fraud here.  It's statements by their CEO.

24   It's dissemination of price lists.  It's receiving money back

25   here.  That -- none of that occurred in *Avery*.

1        And so, yes, we have also alleged that certain of the

2   members of these plans live in Illinois and were injured in

3   Illinois.  That certainly could be alleged in far more detail

4   across all of our plans.  But the focus of this claim is that

5   the focus of the fraud primarily substantially was in Illinois.

6   And we think that's within the ambit of what *Avery* says.  We

7   think it's confirmed by subsequent cases post *Avery* that make

8   clear that you don't have to be an Illinois resident to have

9   this claim.

10       And so, once again, we think this is a debate about

11  the law, fine, but it is in no way beyond the pale and subject

12  to sanctions at the very, very outset of the case.

13       That, your Honor, covers their major arguments.  And,

14  obviously, we would be happy to answer your questions.

15       THE COURT:  Okay.  Does anyone else want to chime in

16  on this issue on sanctions right now?

17       MR. BUSHOFSKY:  Your Honor, Jeff Bushofsky.

18       THE COURT:  Go ahead.

19       MR. BUSHOFSKY:  I'm sorry, your Honor.

20       THE COURT:  That's all right.

21       MR. BUSHOFSKY:  If I may have a moment to address a

22  few of those points on behalf --

23       THE COURT:  Sure.

24       MR. BUSHOFSKY:  -- of Walgreens.

25       THE COURT:  Okay.

1    MR. BUSHOFSKY:  One thing that was a little bit

2   surprising and confusing to our side was the reference to

3   earnings calls and things like that.  We can't find that.  If

4   counsel could direct the Court and opposing counsel to which

5   complaint that is and which paragraph in which complaint.

6    MR. GARDINER:  It's -- counsel, it's paragraph -- I'm

7   looking at the initial complaint that was filed with the larger

8   number of plans.  I -- sorry, I don't have the case number on

9   it.  It's paragraph 62.  And it's not -- and, again, we're not

10  limiting our argument about the nexus to Illinois to that

11  paragraph.  It's simply noting that we're not only talking

12  about the fact that they're headquartered there, their

13  executives were directly involved both in the creation of the

14  fraud and in the ongoing covering up of the fraud for the

15  entire period.

16    MR. BUSHOFSKY:  Your Honor, Jeff Bushofsky.  If I may?

17    THE COURT:  Sure.

18    MR. BUSHOFSKY:  I think that the references to BCBS of

19  Minnesota, which is 1 20 CV 1853, and I think that counsel is

20  mistaken about -- well, okay, I take it back, your Honor.  I

21  see there's a reference in the footnote to a letter to

22  shareholders, so I'll withdraw that.  Thank you, Counsel.  That

23  was what we didn't see originally, so I appreciate that.

24    Going back to the point -- and I'll try to keep them

25  in order, your Honor, from the first points to the most recent

1    ones -- the question about timing.

2         Your Honor has obviously the discretion to set this

3    motion for whatever schedule your Honor would like.

4         The reason that we brought it when we did -- first of

5    all, I'm a little bit whipsawed, I think, by the argument that

6    we should have raised this earlier, on the one hand, and we

7    should have raised it at the first possible opportunity,

8    including in open court, and then on the other hand, why deal

9    with this now, these types of motions should be brought or at

10   least addressed at the end, not at the beginning.

11        And so let me try to give you some insight into why

12   counsel for Walgreens and Walgreens decided on the timing that

13   we actually executed.

14        First of all, as counsel, you know, before this Court,

15   I would not raise the specter of sanctionable conduct by

16   opposing counsel or the other party in my first appearance

17   before the judge when my firm and my client hadn't reached the

18   important decision to bring such a motion.  So that's why we

19   didn't bring it up or the idea that we were thinking about it.

20   We shortly thereafter came to the conclusion that we would send

21   a letter that's required by the rule and by the practice in

22   this circuit and see what the response was.  And only after we

23   saw the responses, including the Rule 11 responses, as well as

24   the responses in the briefing on the Rule 12 motions, did my

25   client come to the conclusion that a Rule 11 sanction motion

1     and a Section 1927 motion was supported and should be brought.

2     And so that's why we didn't bring it the first time we thought

3     it was a gleam in our eye.  We waited until we had the answer

4     from counsel and their client.

5          And then why didn't we wait.  Well, again, we would be

6     stuck in a little bit of a catch-22.  Counsel is already

7     arguing that we should have raised it earlier, while also

8     saying this should wait until the end.  We brought it when we

9     did based on our review of the case law, our understanding of

10    Rule 11 and the statute, and the fact that we wanted from a

11    practical perspective to perhaps end the barrage of baseless

12    claims and cases.  These cases are coming with some regularity.

13    There's almost half a dozen, representing 30 different Blue

14    Cross/Blue Shield insurers.

15         If the plaintiffs' counsel intends to bring cases on

16    behalf of the next 20 states that have Blue Cross insurance,

17    and I believe that's possible, but we don't know what's going

18    to happen next, and we don't have any control over plaintiffs

19    and their counsels' strategy for bringing what is essentially a

20    mass action through half a dozen cases or more, splitting up

21    the different insurers in a way that does not make obvious

22    sense to us just looking at the contracts that are at issue and

23    what states these Blue Cross/Blue Shield insureds are in.

24         We raised it when we did as at the first opportunity

25    that we believed we had -- you know, we had the law on our side

1    and we understood the arguments that were being made, if any,

2    in opposition to our points in the Rule 11 letters.

3          And, frankly, we're hearing a lot today, and I just

4    heard a lot, that are nowhere -- it's nowhere in the letters

5    and nowhere in the motion practice.  I mean, some -- some

6    interesting arguments that you would have thought would have

7    been raised in the opposition briefs.  As I understand it, in

8    all five of these cases, opposition briefs or motions to

9    dismiss are now on file.  Several of these arguments weren't

10   made.  Several of them weren't made in the Rule 11 letters

11   either.

12         *Garbe*.  I just want to address that case very quickly.

13   I think that's going to be important both for this motion

14   practice and for the different motions to dismiss.

15         That case involves Medicare and Medicaid rules.  I

16   hope and I'm sure that the Court will look at that case.  I

17   think that the heavy reliance on that case and its brief

18   holding about U and C prices is not nearly as helpful or

19   helpful at all for the plaintiffs' case and certainly not

20   through this motion.  The sort of the punchline language in

21   that case dealing with U and C is that unless state regulations

22   provide otherwise, the usual and customary price is defined as

23   cash price offered to the general public.

24         While our case has nothing to do with Medicaid or

25   Medicare rules or guidance or manuals for government programs,

1    that logic that's embodied in that opening line of the section

2    of that case that deals with U and C prices is exactly our

3    point.  This is a situation where there are particular terms

4    that, quote, provide otherwise and say that these types of

5    programs are not to be included in U and C reporting from

6    Walgreens.

7              And so, again, in addition to the fact that it deals

8    with a bunch of rules, regulations, and guidance that have

9    nothing to do with the contracts at issue here, the holding

10   doesn't even support counsel's argument.

11             *Corcoran*, the Ninth Circuit case, is similarly

12   inapposite.  It didn't involve the same contracts.  It didn't

13   involve the same parties.

14             And in our motions, particularly the motions that are

15   before your Honor today, we're not talking about contracts that

16   pre-existed or even in the course of dealing that pre-existed

17   the contracts that very clearly exclude discounts from U and C

18   pricing.

19             We're asking for sanctions on the parts of the claims

20   and the claims that improperly and without foundation allege

21   that my client committed fraud and owes tens or hundreds of

22   millions of dollars under contracts that explicitly exclude

23   discounts from U and C pricing.

24             The Alabama Blue Cross/Blue Shield arguments are new

25   to me.  The Alabama arguments that we've made in our Rule 11

1    motion, the letters, and our 12(b)(6) arguments were

2    unaddressed by counsel and by Blue Cross/Blue Shield of Alabama

3    in their responsive letters and in their opposition brief.

4         This point about a DOJ settlement with Walgreens from

5    a False Claims Act case that related to government programs, I

6    have that DOJ settlement in front of me.  There's no need for

7    discovery.  It's a public document on a public docket from an

8    unsealed False Claims Act case.  It says nothing of the sort

9    that counsel was just characterizing to the Court.  It

10   absolutely does not say that Walgreens admitted that its PSC

11   program was a sham or that it gave back all of the membership

12   fees to the consumers that were at issue in that case.  As

13   inapposite as that case is because it doesn't involve these

14   contracts and it was a False Claims Act case by the government

15   to a relater related to Medicare and Medicaid claims, it

16   doesn't even say what counsel said.  And then, more

17   importantly, that settlement wasn't attached to any complaint,

18   and it wasn't attached to any briefing in opposition to our

19   motion to dismiss, and it wasn't referenced or attached in the

20   responsive Rule 11 letter.

21        It's not appropriate and we don't think helpful and

22   effective to raise these issues at oral argument for the first

23   time.  And that goes right to why Rule 11 and Section 1927

24   actually exists.  We've put a lot of time, effort, and

25   distraction of both the Court and counsel and the parties into

1    these issues and are hearing arguments for the first time right

2    now, which we think are waived.

3            And, finally, under *Avery*, it sounds to me like

4    counsel is inviting the Court to reopen those bad old days of

5    50-state Consumer Fraud class actions being filed in Illinois

6    by plaintiffs' lawyers and around the country against Illinois

7    corporations.

8            The claims and the arguments that have been made in

9    the complaints and in the briefing and today are completely

10   incompatible with the holding in *Avery*.  These cases that

11   counsel alluded to that came after *Avery* that support --

12   supposedly support his clients' position, we haven't seen them.

13   They weren't mentioned in any of the opposition briefs where

14   they had ample opportunity to bring these cases to our

15   attention, and counsel didn't cite any today.  What I would say

16   is State Farm is an Illinois company that is based in

17   Springfield -- or Bloomington, rather, and the allegations in

18   *Avery* were that there was this massive fraud that was designed,

19   orchestrated, and then emanated from Bloomington, Illinois, all

20   over the country, with misrepresentations to different

21   insureds, different policyholders -- which, by the way, the

22   fact that it's a case about insurance and policyholders in

23   different states makes *Avery* even more apropos for this

24   argument -- and the allegation was that this fraud that was

25   orchestrated from Illinois, projected from Illinois, sent

1    around the country, about the lie that after-market parts were

2    just as good as original equipment parts, and based on that lie

3    State Farm defrauded policyholders and gave them less money for

4    their repairs or their totals than would have ordinarily

5    been -- they would have been entitled to under contract.

6    There's no way to distinguish that situation from the situation

7    here.

8          Counsel just said other CEOs in Illinois, the fraud

9    emanated from Illinois -- it doesn't matter if the insurance

10   companies' money, you know, was sent from Illinois or received

11   in Illinois or whether any of the claims were in Illinois.

12   What matters is where the fraud was cooked up and where it was

13   projected from.

14         That's completely, completely undermined by *Avery*.

15   And there have not been cases that have survived motions to

16   dismiss or appeals, certainly, in Illinois since *Avery* where

17   the basic theme was Illinois company defrauds people outside of

18   Illinois.

19         There was one named plaintiff in *Avery* who was in

20   Illinois.  His claims and the Illinois claims in *Avery* were not

21   dismissed based on the same theory that all of the other 49

22   states' class claims were dismissed.  Instead, it turned out

23   that that particular Illinois plaintiff didn't have a claim and

24   didn't have standing because he wasn't damaged, but everybody

25   else lost their claims and the nationwide class was vacated.

1   Same situation here.  This is -- this is the mass -- mass

2   action equivalent of *Avery* with the same type of theory, and it

3   doesn't work.

4           Any questions, your Honor, I'm happy to answer them.

5           THE COURT:  No, no.  So here's what I'm going to do,

6   folks.

7           The basis for the motion for sanctions is so wrapped

8   up in the motion to dismiss, the only way that I would be able

9   to determine whether sanctions would even be reasonable under

10  the circumstances is to really decide the motion to dismiss and

11  understand the law.

12          So with that in mind, I'm not going to rule on this,

13  of course, but, more importantly, I will give the other side an

14  opportunity to respond to it.

15          I don't think you need to be briefing that right

16  now -- well, let me just check on the status of the motion to

17  dismiss briefing.

18          Is it fully briefed?

19          MR. BUSHOFSKY:  Your Honor, I believe that the

20  plaintiffs -- this is Jeff Bushofsky.  I apologize, your Honor.

21          The plaintiffs owe a reply brief for a couple of the

22  cases, and then everything will be fully briefed -- I'm sorry,

23  I take it back.  I misspoke.  There's one -- there's one

24  tranche of briefing that I believe is still open.  That's --

25  that was my point.

1          THE COURT:  I don't want to really brief the motion

2     for sanctions until I finish with the motions to dismiss.  It

3     makes no sense for me to be looking at the other while I'm

4     trying to determine the law on the first.

5          So what I'm going to do is we'll order a briefing

6     response to be filed two weeks after my ruling on the motion to

7     dismiss, if appropriate.  Okay?  And I'll let you know in the

8     motion to dismiss.

9          That way I can deal with just focusing on whether or

10    not there's a valid cause of action.  All right?

11         So I'll take all of your arguments under advisement

12    until that time, and I'll turn my attention to the pending

13    motions.

14         MR. BUSHOFSKY:  Thank you, your Honor.

15         THE COURT:  Thank you.

16         MR. GARDINER:  Thank you, your Honor.

17         MR. BUSHOFSKY:  Your Honor, it's Jeff Bushofsky again.

18         The next time that we're before your Honor, at least

19    virtually, I think is January 6th, just for planning purposes.

20         THE COURT:  Okay.  Well, if I get my opinion done

21    before that, you'll be called in earlier than that.

22         MR. BUSHOFSKY:  Thank you, your Honor.

23         UNIDENTIFIED SPEAKER:  Thank you, your Honor.

24         THE COURT:  Thank you.

25      (Proceedings concluded at 12:45 p.m.)

C E R T I F I C A T E

     I certify that the foregoing is a correct transcript, to

the extent possible, of the record of proceedings in the

above-entitled matter, given the limitations of conducting

proceedings via telephone.


*/s/ GAYLE A. McGUIGAN*                         *October 22, 2020*
Gayle A. McGuigan, CSR, RMR, CRR                         Date
Official Court Reporter